Thank you, Chief Judge Kuczynski. May it please the court. One of the key, if not the key question before this court today is whether trial counsel have a duty to investigate what the district court concluded were lingering doubts when it came to mitigation evidence and mental health evidence. In 1985, Mr. Leavitt's two trial attorneys conducted what can only be categorized as an exhaustive mental health investigation. Irrespective of that investigation, Judge George, the trial court, concluded that the death penalty was warranted. Of course, in 1989, the Idaho Supreme Court reversed that decision because Judge George had not properly articulated his consideration of the mitigating factors. And as a result of that, David Parmenter was assigned to conduct the resentencing of Richard Leavitt. And had, quite frankly, what can only be categorized as a daunting task before him, because he was before the same judge who had denied Leavitt's prior attorney's motion for an MRI because mental health evidence wasn't going to be a significant factor, and had concluded that it was not going to be a significant factor. He concluded that the mental health evidence that was presented was not mitigation, but was aggravation, and had imposed the death penalty based primarily, if not exclusively, upon the absolutely horrendous nature of the crime, the murder committed against Annette L., particularly the anal cutting and the removal of her female organs. Now, we know that our first trial counsel's presentation of mitigation and actually investigation of mental health was, for all intents and purposes, exhaustive because they had all of the prior mental health records. He did ask for money to do an MRI. This is the first lawyer, right? That is correct. He did ask that the MRI be completed. So he must have thought, based on that exhaustive investigation, that the MRI would likely lead to, or could reasonably thought to lead to, evidence that might be mitigating. Your Honor, that's the lingering possibility that the district court referred to. I don't believe, Your Honor, that there was sufficient evidence before the trial court, either prior to the first sentencing, the second sentencing, or at any time, to warrant the ordering of that MRI. In fact, if you look at Dr. Grover's testimony I understand, but that wasn't my question. I'm sorry, Your Honor. I just want to make sure we're talking the same language and, well, we disagree, so if you disagree, that's fine, but I just want to make sure you're disagreeing about the same thing I'm asking. The first lawyer asks for money to conduct this investigation, the MRI. That is correct, Your Honor. Okay. Just yes is fine. Yes? Yes. Okay. He must have thought it's important, if he asked for money, to do the MRI. We don't Are you able to answer that yes or no? We don't know, and the reason I He thought he'd sort of like to play with the technology? You think that might have been the reason? Your Honor, all we know is that he had a request from Dr. James, who was the final expert prior to the first sentencing. The doctor says to him, there is a possibility that this could be organic, and the way to nail that down, the way to foreclose that possibility or to confirm it, is to do an MRI. Possibility would be the key word, yes. But I would submit to the court that counsel aren't required to go out searching or confirming or denying possibilities, particularly when I haven't gotten there. I'm sorry, Your Honor. I'm still talking about the first lawyer. He must have thought it was worth doing. We don't know what his thought process was. You think he did it randomly? I think he was simply following up on Dr. James' suggestion that an MRI be completed. You don't think it's a reasonable inference that if he asked the court for money to do this, that he thinks this is something that might help his client? I mean, he didn't do it for fun, right? He didn't do it to say, gee, I've never seen an MRI. I'd love to see what it looks like, this new technology. He wasn't doing it because, gee, I think it would be nice to spend Idaho's money senselessly. He didn't do it for those reasons, right? Again, Your Honor, we don't know from the record that we have other than that he had a suggestion. What did he say in his motion when he asked for the money? It was an oral motion, Your Honor, that was presented to the court. And there wasn't, I believe, an affidavit that supported the motion. There are no transcripts in Idaho? Yes, Your Honor, and we've provided the transcripts of that oral motion to the court. I don't remember. What does it say? It simply says, we feel that the test may very well reveal organic or physiological problems with Mr. Levitt that could be of significant mitigating factor as far as whether the court would impose the death sentence or a life sentence. Okay, so when I asked you earlier, he must have thought this would be helpful, your answer was, well, yes, right here he tells us what he thought. He says, I, you know, it's not like, oh, we have no idea or anything like that. That's really trying to hide what you know is in the record. It doesn't really, it doesn't give you credibility. It doesn't sort of make me respect you as an advocate to have you have the answer to my question written out right in front of you in the words of the lawyer whom I'm asking you about and have you give me answers like, I don't know, we can speculate, this is just a guess or anything of that sort. It undermines your credibility, which is really a good way of losing your case right there and then. Just a little tip on advocacy. So let me ask my question one more time, and let's see if we can get this one right this time. The first lawyer asked for the MRI, yes or no? Yes. And when he asked for the MRI, he must have thought that this would be something that would be helpful in finding mitigating evidence. Yes or no? Yes. There we go. That wasn't so difficult. You didn't have to make a fool of yourself first to get to that answer. Right? You could have gotten to this much sooner. May I ask you what difference it makes what was in the first lawyer's head? Absolutely none, Your Honor. Okay. So why don't you go on from there? Well, is that right, or do I have to pull this answer out of you as well? Isn't if the first lawyer was competent, and you think he was competent, but you're not admitting his first sentencing counsel was incompetent. You're not arguing that, are you? No, Your Honor. Okay. So if competent counsel thinks that this is an avenue that he needs to pursue in order to find mitigating evidence, doesn't that suggest that is a reasonable thing for a competent counsel to do? After all, he was competent. Are you saying he was unreasonable? Do you want a yes or a no answer, Your Honor? If you can, yes. Do you think he was unreasonable? No. Okay. So what's going on in his head does seem to matter, doesn't it? If he was a competent lawyer doing the very same thing that Mr. Parmentier was doing and being in exactly the same situation, and he being a competent lawyer asked for this piece of evidence, why isn't that relevant to determining what a competent lawyer would ask for in these circumstances? Because, Your Honor, all the first attorneys were doing were simply going out and searching for possibilities. And it's the State's position that the mere possibilities are not required to be researched. Everything. There's a possibility of everything in this world. And there has to be some kind of a factual basis to warrant the additional testing. Isn't there a factual basis that the mental health expert who examined him said that this would help us determine whether there was organic disease? Actually, I don't believe Dr. Jaynes stated that it would actually help make that determination. Dr. Jaynes' affidavit, as I stated, was very short. It does say the abnormality shown by the CAT scan could possibly affect the cognitive function. It suggests that it should be done. There may be a suggestion, Your Honor. I will agree to that. But the CAT scan result suggests that this further test should be done. That's just some remote possibility of going out, speculating, and dreaming up? Your Honor, that's all it was in this case. As I stated, Dr. If the expert doctor says that the CAT scan result suggests that the MRI should be done, that's only some kind of remote possibility out in the air? Well, Your Honor, the expert's got to have some kind of a reason for that. And we don't know from Dr. Jaynes' report or from his affidavit what the underlying basis was. In fact, we know from Dr. Groberg that it was, quote, very unlikely that there were going to be organic findings made. That's on page 1341 of the excerpt of record. If it's unlikely, then why would the state go to the expense of ordering an MRI if it's unlikely there's going to be an organic basis? It's better to execute somebody than for the state to go to the expense of ordering an MRI. I don't know what an MRI costs. Do you have any idea how much an MRI costs? I don't know what it cost in 1989. How much money do you think the state shouldn't spend if it might result in not executing somebody who should be executed? It isn't a question of how much money should be spent. It's whether there's a basis for it. I don't know if you weigh this against, I mean, as you said, the reason not to conduct an MRI is the amount of money it would cost the state. Why should the state, you told us, go out and spend all this money when it might tell us, but we're not sure it'll tell us that there's an organic disease, but Dr. James says it may. That's the kind of test that the expert says should be performed. Now, let's assume you're right about Dr. Groberg and that he has the same knowledge and experience. Let's assume you're right and one expert says it should be done, the other says I don't think it will tell us anything. Now, you say, well, with those two conflicting opinions, why should the state spend all that money? I was just wondering what kind of money it costs to perform an MRI. And, Your Honor, I'll repeat. I don't know. All right. Would you feel the same way if it's $10 that the state shouldn't be required to spend to see whether it's right constitutionally to execute someone? Your Honor, the problem that I'm having is that. Well, I think I understand the problem you're having. There are always possibilities. The problem I've got is that what is before us is a question of ineffective assistance of counsel at the second sentencing. First lawyer asked for the MRI. Judge said nope. Right? Yes, Your Honor. That's correct. So now the question is whether Parmeter was deficient in his performance by not repeating the same request to the judge who had just denied it. And I can't envision why he would, his performance would be deficient. For this reason, Parmeter did exactly what the two prior attorneys had done. If the two prior attorneys' performance was not deficient and nobody. No, I'm sorry. He did not ask the judge. He did not do exactly the same thing because the prior attorneys asked the judge for the MRI. He didn't do that. That's the only thing he didn't do. So, again, standing there and saying he did exactly the same thing only undermines your credibility. It makes you seem like you're trying to prove something. The very thing we're talking about is the thing that he didn't do that was different. Now, did you hear Judge Ramos' question? I believe I did, Your Honor. And as I understand the question. Why don't you try answering her question? I thought I did, Your Honor. Did I not answer the question? You know, to tell you the truth, this has gotten so distracting, I can't tell you. Well, the question, as I understand, was was he ineffective by failing to ask a question again when the judge had already said once, had said no. And you went off on a tangent about how he had done exactly the same thing. It had nothing to do with the question. Was he ineffective in failing to repeat the question? No, Your Honor, he wasn't. Okay, explain. The reason he wasn't is because he had no obligation to file a motion that had already been denied. It was res judicata? I'm sorry? Law of the case, res judicata? No, it wasn't res judicata, but there was no additional evidence warranting the refiling of that motion. Well, he got reversed. The tangent had gotten reversed by the state's highest court. That often has a chastening effect on judges. Four years or so had passed. The price of MRIs had plummeted between 1989 and 1993 or 94, whenever he came back. The MRIs were still quite new in 89. They were old hat by 93. So why wouldn't it be appropriate to make another request in light of the new circumstances? Your Honor, I don't know of any law that provides for the mere passage of time to simply redo a motion. You recall the lawyer's testimony that the judge was a rather flexible judge, unlike some of these hard-line judges, as he put it? And this is the kind of judge who can change his mind with decent arguments? And yet, Your Honor, when Parmenter and Levitt themselves both asked for another PSI prior to the sentencing, no PSI was ordered in this case. Levitt asked also for the additional psychological evaluation. Parmenter didn't follow up on that. But there was no written – the judge didn't give them an additional PSI, despite the passage of four years. I think that's significant because it establishes that Judge George really wasn't going to change his mind in this case. If he didn't, then perhaps the lawyer would still accomplish something. He would make a record of a judge refusing to do something. Perhaps he would. So what was the harm of asking for another – for asking for an MRI? What's the reason not to do it? Your Honor, there was no harm to ask. But as the United States Supreme Court said in Knowles' issue just last term, Strickland has never had a nothing-to-lose standard. And certainly, you know, murderers are – have a different brain than all – most of us. Because you don't go out – normal people don't go out and do what Richard Levitt did to Danette Held. There was nothing to lose. You mean all murderers have organic brain disease? I'm sorry, Your Honor? All murderers have organic brain disease? No, that's not true. But what I'm saying is that the nothing-to-lose standard is not part of Strickland. And that was in response to your question of why not do it. You told me all murderers have something – different kinds of brains. Normal people don't go out and stab innocent victims 20-something times, cut their anus, and remove their female parts, Your Honor. Yes. That may be a good argument for why this is ineffective. If he could have proved that there was organic brain disease and didn't, because all murderers have organic brain disease, that's a different argument than I've heard before. And again, Your Honor, I'm not saying all murderers have organic brain disease. I'm saying that normal people do not go out and do what Richard Levitt did to Danette Held. And if we follow that logic, then every attorney in this country, every defense attorney that has a capital defendant has to go out and automatically ask for an MRI. And Strickland doesn't require that. Could I ask you one question that may not be material or may, I don't know, but I've been wondering about? Why is it that the State thought it was important to get an MRI after one had been taken, the doctors couldn't tell anything from it, and then the State said, this is really important to have an MRI, and persuaded the judge to get one 10 years later, which showed that there was brain disease? Well, quite frankly, Your Honor, and this is not in the record, I can tell you what my thought process was. We did not know what the results of the 1996 MRI were because they weren't disclosed to us. We couldn't get them. And, you know, for right or wrong, I decided, well, if they're not going to give them to us, then it must indicate that there's nothing wrong with that 1996 MRI. And I want to confirm that. And that's why we went out and did that. Now, we subsequently found out that we were right. Dr. Beaver concluded in 1996, and Dr., I can't remember his name now, the radiologist, concluded in 1996 from the MRI that was given that there was nothing wrong with that MRI. Which brings me to the next argument, and that is, let's assume that David Parmenter, that there was something, something that warranted his asking for the MRI in 1989. What would he have gotten? He would have gotten the MRI from Dr. Beaver that established that Richard Levitt's brain, there was nothing wrong with it as far as the MRI. We definitely now have a factual finding that the doctor who testified and reviewed the 2006 and found there was something wrong, that his testimony was that the earlier ones would have shown that also. And the district court accepted, made a finding of fact that that was correct and persuasive. And we are obviously cannot dispute that factual finding. There's evidence to support that finding. What I am saying is that if you put yourself in the position of David Parmenter, which you must, you cannot use 20-20 hindsight, The 1996 MRI would have established that there was nothing wrong with Richard Levitt's brain. Nothing in the sense that there were no white matter hyperintensities, I should say. There was nothing showing organicity as far as whatever mental problems he had. And that's critical in this case. Where do you get that? I'm sorry, your honor? Where do you get that? I'm completely, I'm confused. I thought you said you can't challenge the finding that the earlier MRIs would have shown the white matter. If they had gone and shopped for Dr. Bigler instead of Dr. Beaver. Well, I thought that the district court found that the earlier MRIs would have shown it. According to Dr. Bigler, Bigler was their subsequent expert right before the evidentiary hearing. But Parmenter wouldn't have hired Bigler. Well, whoever would have hired, I think the finding of the district court is that the MRIs would have shown that. And I guess you're saying that even though the MRIs would have shown it, he might have hired an incompetent doctor. Your honor, all I can come back with and say is that Dr. Beaver and the radiologist both said that that 1996 MRI was normal. Now, we can always go, counsel can always go out and find an expert that's going to disagree with another expert. But you said you can't challenge the district, and you're right, I think, that you can't challenge the district court finding that the earlier MRIs would have shown the white matter. And whatever conclusions you draw from it. So your answer to that is, well, Mr. Parmenter knew that if he had the MRI taken, he would have hired a man who wouldn't have been able to recognize it. Is that the argument? And that's entirely conceivable, because Dr. Bigler is the windfall that Leavitt received in the federal evidentiary hearing that he wouldn't have gotten in 1989. Because you asked for another MRI. Because the state asked for another MRI. If the state hadn't have asked for the MRI in 2006, we have the 1996 MRI, we have Dr. Beaver. We wouldn't have known the truth if you hadn't asked for the MRI, as the district court finds it. And perhaps as the district court finds it. But we certainly would have, Parmenter would not have had that additional information, is what I'm saying. Well, he didn't have any information, because he didn't have an MRI taken. That's correct. But if he had... You want us to speculate? But if he had, he knew that if he had an MRI taken, even if it showed the result, that the doctor wouldn't have recognized it. That's true, Your Honor. That's true. But he couldn't know that even if it showed it, he would have had a doctor who wouldn't have recognized it. How could he have known that? He couldn't have known that. Which is why he wouldn't have gone and hired Dr. Bigler. He would have maintained, he would have stayed with Dr. Beaver's opinion. That opinion would have been presented... He didn't know what Dr. Beaver's opinion would have been when he didn't ask for the MRI. But they did in 1996, Your Honor. And that's the problem that I have with this case, is that we know that defendants are not permitted to go shop for other experts. And that's what happened in this case, is that they had Dr. Beaver's opinion, the radiologist's opinion in 1996, and then we go and shop for Dr. Bigler's opinion in 2006. And that just doesn't constitute deficient performance. As far as the prejudice problem, Your Honors, the one thing that I would like to say, because my time is short, that I understand that this Court and courts across the land have reversed cases based upon ineffective assistance of counsel in mental health areas. But when you look at Judge George's findings, particularly at the resentencing, this death sentence was imposed because of the extraordinarily heinous nature of this murder, and particularly the anal cutting and the removal of the female organs. Well, he should be in good shape when you go back for resentencing. Why take all this time and all this effort? Can I just go back? Is Judge George still there? No, Your Honor, he's not. Well, I'm sure if it's successful, we'll see it the same way. Well, I would hope so, Your Honor. Unfortunately, the expense associated with resentencing in Idaho now, because it's now jury sentencing, is enormous. I don't know if the local prosecutor will seek the death penalty again. It's basically a retrial, Your Honor. Above and beyond that, they still have to show prejudice. And when you distinctly look at this case as opposed to the other cases, Judge George would have imposed the death penalty irrespective of what any MRI showed. Does he say that? Does he say even if there's organic brain damage, it doesn't make any difference? Your Honor, I think if you look at his findings in their totality, well, no. I'm going to answer that directly. But if you look at the totality of his findings, all of his findings, particularly where he says it is difficult to conceive of any circumstance that would outweigh the picture presented to the court of the crime scene, that tells me pretty close that it's going to take something enormous for Judge George to find that the death penalty was not warranted in this case. Particularly, as this court found in Levitt 1, when you impose the added organ-removing mutilation of the victim as part of the death-dealing attack or as a grisly aftermath. Judge George viewed those pictures, simply could not believe the brutality and the sadistic nature of this murder. And your view is if there had been an expert there that had persuaded him that Levitt was hallucinating and believed that he was a famous surgeon and what he was doing is saving this woman's life by excising cancer, let's say. Let's say an expert said that, Judge Levitt would have said, doesn't matter, death penalty. I think in that scenario, Judge George would not have given the death penalty. I think that's a far cry from the facts of the case. It certainly is a far cry, but it does suggest that he wasn't entirely movable. He says he couldn't imagine. Now brain, organic brain damage is sort of in between, isn't it? Organic brain damage, I concede, is compelling mitigation. But as Judge George found, at least with respect to the personality disorder, and the words elude me right now, that while the murder may have started out as an anger problem associated with his brain, certainly the anal cutting and the removal of those female victims was calculated and had nothing whatsoever to do with his brain. And there's nothing from the federal evidentiary hearing establishing some type of causal connection between that organic brain disorder and the anal cutting. And I recognize that for mitigation there doesn't have to be a causal connection. But certainly, if there is not, it diminishes the strength of the mitigation as far as the organic brain is concerned. You have half a minute. Do you want to save it? Yes, Your Honor. Thank you. Okay. We'll hear from somebody on behalf of Petition. Are you somebody from Boise or somebody from Ketcham? I'm somebody from Ketcham. Andrew Parnes on behalf of Mr. Levitt, the Petitioner. I will address the deficient performance issues. Mr. Nevin will address the prejudice matters. Could I ask just a couple of questions to get benefit of what you know about what the record is? What is the difference between intermittent explosive disorder and an emotional dysfunction aspect to the right frontal lobe that is suggested by the presence of the WMHs? Right. Your Honor, let me address that briefly, if I may. I think that goes to prejudice more than this. But the intermittent explosive disorder, when there is an organic, what the experts testified to at the evidentiary hearing, was that when there is an organic basis for this emotional dysregulation, it is not considered and not properly diagnosed as intermittent explosive disorder. No, I understand that, but I don't understand what either one of them is, which is why I was asking my question. I understand the experts say they are somewhat different. So my question is, what is the difference between the two? Because the Idaho Supreme Court said it had no quarrel with the finding that he did suffer intermittent explosive disorder. So that's what the Idaho Supreme Court said. So now I'm wondering, what is the difference? If you go from either the 1996 or the 2000, in light most favorable to Leavitt, what's the difference? There are two differences. The difference on intermittent explosive disorder is that you react to certain things, you get into rages, but there's a psychological cause for it. It's something that may be controlled, may not be controlled. With emotional dysregulation, you have the same acting out, the same rage, uncontrolled rages. But if it's based on organic situation, if it's based on organic brain disorder, there are controls for that, there are drugs for that, there is a structured environment for that. Okay, so if we get down to what difference that would have made on the sentencing, the trial judge flipped his own assessment of the impact of the intermittent emotional disorder and intermittent explosive disorder and changed it from being an aggravating circumstance in the first sentence to being a mitigating circumstance in the second sentence. So what more would you have expected to happen? If the attorney had done what he, what we believe he should have done and was required to do in this situation, he would have been able to explain, number one, that it wasn't just intermittent explosive disorder. If he had consulted other psychiatrists and other doctors. To which I guess I come back and say the same thing, so what? I mean, if I'm the trial judge and I've already said there's nothing that's going to influence my sentencing about this guy's mental health, and yet I did flip, so instead of considering his mental health evidence as mitigating, I now, as aggravating, I now consider it as mitigating. What more would you, how much more mitigate, let me put it this way, how much more mitigating do you think the MRI evidence. As Judge Windmill found in the district court, that that evidence dovetailed with the fact that the judge made the difference, said this is mitigating now, intermittent explosive, but it pales, it basically is reduced because he's been a good prisoner for four years. And so either he didn't have it and we thought that it was more evident. Well, I thought that was the whole object of the exercise, because he would have weighed heavily in Levitt's favor the lack of future risk of danger if it's from the kind of organic or other mental disorder that's controllable in a controlled environment. And that was not presented to the judge. But the district judge bought that position anyway. The district judge here. Not the district judge. The trial judge bought that and changed his view and said this is mitigating. No, he didn't really change his view. And that goes back to the deficient performance. The trial attorney never said anything about mental issues at sentencing. Well, I know, but I understand. So there was nothing else to present. Had the trial attorney shown to the judge what we showed in the evidentiary hearing to Judge Windmill, what Judge Windmill found was that, number one, the judge would have understood that this wasn't necessarily intermittent explosive disorder, but it was organically based from brain injury. You know, you started once to say you had two reasons. What, did you have a separate, different reason? Judge Ryan has been trying to get you to explain why it makes a difference, whether it's a disorder or whether it's just intermittent explosive. What difference does it make? You said you had two reasons. Well, the reason is, one, it's organically based, and, two, So what is your question? Well, the reason is that Dr. Beaver testified that it would be controllable in a prison setting. Yes, you said that as your first reason. Is that the only difference? I think that is a major difference. And I'll defer to Mr. Nevin on that. Well, then why don't you defer to Mr. Nevin? Okay. I'll do that. Your Honor, David Nevin. It's different for a variety of reasons. And, I mean, at the outset, you have the fact that it's something that happened to Mr. Leavitt. It's a structural injury to his body that he's not responsible for. I'm sorry to be obtuse about it. I just, you know, I'm not a doctor. I don't understand this stuff. So just for you to mouth those words isn't meaningful to me. Can you reduce it to something that makes sense to me? That is, what is a practical matter? I'm a trial judge. Am I going to be influenced by one thing as contrasted with the other? I understand. And let me try this. Intermittent explosive disorder is a personality disorder. It's sort of like saying he's just a jerk. That's just the way he is. He's violent. He explodes. That's just how his personality is on the one hand. But in the particular possible organic affliction that he has, does the same thing. Well, no. It's very, very different. It's different in a really important way. But, first of all, you just have this idea that's in the Supreme Court's cases going back a long way, that behavior that's attributable to a mental illness is important. It diminishes culpability. So it's just, as opposed to a personality disorder, it's something that is inflicted on him, something that can be objectively verified. So there's that difference between an organic defect and a personality defect. The second is that you treat and you handle the organic personality defect completely differently than you do a personality defect. And this is Dr. Beaver's testimony. Dr. Beaver says that when you have somebody who's organic, when you put them in a controlled environment, when you reduce the amount of stimulus that's pushing on them from the outside, they'll be great. They'll be completely manageable. Not true with personality. So then the question that I ask Mr. Parnes is, the judge recognized that and made it a mitigating factor. So how much more mitigating? He recognized that he'd been fine in prison, and he switched from considering the mental condition as an aggravating factor to considering it as mitigating. Yes, but there's a comma there that you need to go on to. Okay, that's what I'm looking for. And what comes after the comma is, but he also decided it had gone away. Because he said, well, now I see, after hearing from the Idaho Supreme Court, now I see I should have treated intermittent explosive disorder as a mitigator. So, okay, I'm going to treat it as a mitigator. But, he said, he hasn't exploded any since he's been in jail the last four years. So I guess that's gone away, or it was never there in the first place. But that's what you wanted him to do, was to consider it as mitigating, right? No, what I wanted him to do was to recognize that he had a structural organic brain defect that had an impact on the way he acted at the time of the crime. He never got to hear that testimony because the defense lawyer never looked into it. And those were two separate things. The judge, at the end of the day, the sentencing judge gets to the place where he's essentially saying, I just don't see that there's any kind of mental illness issue here at all. Because the only thing I'm looking at is intermittent explosive disorder. That's gone away. Or it was never there in the first place. So he says, now, why didn't he explode? Well, it wasn't intermittent explosive disorder. Why does he explode? Well, it just must be. Did he say it didn't? He never said that he didn't have intermittent explosive disorder. The Idaho Supreme Court said it had no quarrel with that finding. No. I'm sorry. Go ahead. It's all right. I'm sorry. In Levitt 1, the Idaho Supreme Court does not say it has no quarrel. It says this does not establish grounds for a new trial. No, that's not. That's just simply not right. Because Mr. Levitt claimed that he didn't do the crime. So therefore, the fact that he had a mental illness, that's not a reason to give him a new trial. It was not done in the context of mitigation at all. Mental illness doesn't come up in the context of mitigation. We do not disagree with the findings of the trial court that the defendant is possessed of an intermittent explosive disorder, quote, unquote. Well, Your Honor, in the first sentencing, he made that finding. In the second sentencing, he says what the judge says during the sentencing hearing or during his findings is that seems to have faded or perhaps it was never there in the first place because he's been a good guy in prison. And if he had heard the testimony about the effect of intermittent explosive disorder, he would have known. I'm sorry. About organic. He would have understood at once that the fact that Mr. Levitt had been good in prison over the past four years was a direct confirmation of the proposition that he was organic. And he never got to hear that. So I think that's the way in which it makes a significant difference. And the way it makes a difference if it's organic is just maybe complete the thought. I mean, in a sense, everything that happens in the brain is organic. I mean, you're born with certain matter in your brain, certain neural pathways, and then certain things happen along the way. I mean, either you're sort of wired differently than somebody else to begin with or you get some sort of disease or a trauma or, you know, somebody shoots bullets or people have lived through chunks of their brain removed by, you know, bullets or things of that sort. And I am, you know, so all of those things might affect behavior. And I'm trying, it's almost metaphysical. Is there less moral culpability? Is there some reason to say somebody who's had one kind of defect in the brain, you know, physical defect, is less culpable, less likely to marry a death penalty than? Where does that notion, can you expound on that? Yeah, and I suspect that if we fast forwarded a hundred years, say, we might be looking at this completely differently because it's a product, we're a product of where we are now. And we make this distinction between personality-based defects, which you might say are one way of defining that would be defects that we can't find an organic cause for because of the nature of our testing. But that changes all the time, and it probably will continue to change. You know, you raise a, or Judge Ramerts raised a basic question about punishment. You know, why do we punish people? And the prosecutor here has also raised that question. You know, obviously there's something wrong with all people who commit these murders. Some of them we execute, some of them we don't. People who commit other crimes do them for reasons that we blame on them. And perhaps if you went all the way back to find out why they commit those crimes, you know, is it because they were born the way they are? Is it because they're influenced by their environment? Why is one person influenced by environment one way, not another? I mean, these are all very fundamental, fascinating questions that might call a whole system of punishment into question. But you're right, we have to look at it the way our courts do today. And my impression is courts have looked at a physical brain disorder differently than they have looked at what they consider a simple personality disorder. Whether that's a justified distinction, I'm not really sure. And Judge Ramerts says, well, why is that a distinction that requires different treatment? I'm not sure it does. But my impression is that our cases treat them differently. And you may well be right. As we learn more about the brain and about the basis for punishment, maybe that distinction will be eliminated. Well, it's one of the fascinating parts of Dr. Bigler's testimony is that what he's finding is that there's a very high correlation across all mental health disorders and the existence of white matter hyperintensities. These are lesions. These are places where there is a defect, a very small, but very small defect, nonetheless physical defect in the brain that affects the way electricity flows in and out of that area and it affects emotional functioning. It's present in diseases like multiple sclerosis where it's much more pronounced. Lou Gehrig's disease and so on are higher examples of this. But it's the same thing. We don't have a track record of MS killers or Lou Gehrig's disease killers. Right. I mean, people have these kinds of changes in the brain and yet most overwhelmingly don't... Don't commit murders. Yeah. But there is, and there is an incidence of these white matter hyperintensities in persons over the age of 50 who are normal, but that's much less common for a young person like Levitt was, who was 27 at the time, that that CT scan was done by Dr. James back at the beginning. Yeah, but that was on the other side. Well, it was, although CT scans are much less precise and it also referred to the possibility of a demyelinating disease and that is exactly what these white matter hyperintensities are. They are demyelinations. They are breakdowns in the myelin sheath around the nerves. And so I think that the CT scan is a foreshadowing of exactly what showed up on the MRI in 1996 when it was finally done. So these things, our expert in effective assistance, Tim Ford, testified and the testimony is unrebutted, that organic brain injury is the holy grail of mitigation. And you can quarrel about whether that's right or wrong. So which Judge George are we looking at in terms of... Do we look at the Judge George who says, I don't want to hear about brain defects in the first sentencing. It doesn't make any difference. I'm going to sentence him to death. Or do we look at the second and arguably more pliable Judge George on remand? And there's a third possibility. When we sort of replay, this is the ineffective assistance of counsel replay, prejudice phase, what we have to do is say, okay, let's now assume counsel had done something different. Let's play the scene again with sort of the change and see what... So who would be the judge? You said there's a third possibility. Well, the third possibility is that we look at a reasonable judge, whatever that is. Isn't that what Strickland says to do on the prejudice prong, not on the performance prong? Right. And it does. And what Judge Windmill said was, I'm not going to let anything into the record about what this judge was like in terms of his personality. So does he have the milquetoast personality that had come up? I'm not going to let that in. But if there's something on the record that he says that specifically indicates why, then I'll consider that, what his inclination was. He did say, right, I don't want to hear about any mental... I forget the exact words he used, but you know what he said. I know what you're talking about. And that's important to understand. That occurs in 1985 at the first sentencing hearing. That's why I asked you, which Judge George are we looking at? Right. And, you know, obviously I think we're looking at the second Judge George, because that's the one where the lawyer had the opportunity to speak to him and to try to change his mind. Well, you're not suggesting that Perlmutter couldn't factor into his strategy that the precise motion for an MRI had been asked and denied in a prefabricated order, showing how strongly the judge viewed the notion of a continuance for such a thing and specifically said, I just am not going to be influenced by any further mental evidence in this case. I mean, he could factor that in, certainly. I agree that he could. I don't agree that he did. And I also don't agree that he... Well, he said he did. Well, actually what he says is if... He says that must have been what I was thinking. Well, okay. Well, I mean, I think there's a difference, because this Court's opinions say we don't look at... We look at what the judge... And I think I'm talking about Hamilton v. Ayers here. We talk about what the lawyer did think, not what he could have thought. But set that aside for a second. I agree he could have looked at that as an issue. But Judge Wendell found, our experts testified, and common sense suggests, that that would not have been a reasonable decision for a lawyer to make, particularly under the circumstances of this case. He had so much in front of him and so little reason not to do it. It was absolutely not a tactical choice. He doesn't even claim that it was a tactical choice. He doesn't say, I'm not going to pursue mental health evidence because I'm going to instead treat this... because those two arguments aren't inconsistent. He does not offer a specific reason for why he failed to do this. And when you look at the record, I think it's clear that he just forgot about it or went right past it. And the it is? It meaning pursuing additional mental health evidence in general, which I think in the specific instance here would have involved making a motion to the judge to say, let me have an MRI. The Idaho Supreme Court has sent this case back to you and has said this man is atypical. We're concerned about this. So this was, narrowly speaking, what he was asking for is money? Yes. It's not a trap. I'm just asking a question. Well, yeah. So just so I understand the scenario, Palmatier does not have funds to do this unless he gets, this doesn't sound like a question, but there's a question mark at the end. I'm trying to test whether my understanding of how things work in Idaho. Because I know there are some regimes, including some in the federal system, where the lawyers get a certain amount of money to, and then they allocate what it's used for. So they make a certain amount of money for experts, and they decide, does it go to this, does it go to that, you know, whatever. They don't have to go to the judge for every item. So Palmatier is there, and do I understand correctly that what you're saying is he just doesn't have the $600 to run an MRI? Yes, sir. There isn't $600 or, I mean, I'm saying $600. I had an MRI about that time, and that's sort of what they seemed to run. It was a need. And I think it depends on whether they do it with contrast or not. Yeah, but we're talking about that order of magnitude. Right. This would have been in 1993, maybe? 1989. 1988. The second? First sentencing is 85, second sentencing is 89 and 90. Okay, all right. So we're talking $600,000, something like that, right? $600,000 to $1,000 would be ballpark, yeah. I mean, more or less. And he just doesn't have the money. Palmatier is an appointed, he's appointed to handle this case by the court, and he's paid, presumably paid by the court. I don't actually know. No, I am confident that, I'm not saying can he reach into his own pocket and do it. I'm just wondering, there's no budget that he's allowed for this. He has to go for every single item. He has to go to the judge and ask for approval. That's correct. There isn't someplace he can get a freebie. Well, possibly he could have. You know, sometimes people will, sometimes. No, no, I don't mean, sorry, I don't mean can he get a freebie by, you know, collecting private funds or something. I'm saying this guy is a citizen of Idaho. He's got that problem. There's nothing in Idaho that, if you are somebody who needs a medical procedure like this, the state will kick in, and you're too poor to have it, the state will kick in to do it. I don't think so, Your Honor. Nothing in the record on that. There's nothing in the record on that. No, there's nothing in the record on that. Can I come back to the MRI showing again? Yes. As long as I've got you captive. The MRI shows the hyperintensive foci. The three white men are hyperintensive as well. Okay. And evidently the expert opinion as to what that signifies more or less comes down to We can't say exactly what the cause and effect relationship is because it's not well understood. But it could result in emotional dysregulation without impairment in cognitive functioning. Right? Right. Okay. So there's nothing that says here's exactly what it shows. Now, my question then is, viewing it in the light, in the most positive light for Levitt, why do you think the trial judge would have been influenced by that possibility, sufficient to overcome the facts that Levitt had done the same thing to a deer that he did to the victim, that he had been trying to get into her house the night before and was thwarted, all of the facts surrounding the murder itself, and he came back to the scene, all, just to put it in a colored way, all kind of calculated acts? Yes, Your Honor. I would answer that two ways. First, by comparison to other cases that this Court has looked at, the facts here are, they're egregious, they're horrific. Judge Windmill acknowledges that. The real thing I'm focusing on is how calculated, because you don't just up and accidentally cut someone's innards out, let alone in the way that he did, let alone after having practiced on a deer. So that's not just exactly a, you know, flying off in a complete rage that I can't control. But I think it does offer a partial explanation, and Teneriff v. Jekyll says it doesn't have to be connected directly to the crime at all to constitute mitigation, but this does offer some partial explanation, because it does appear that there is a very violent, that part of the crime is very, very violent, and that the acts that the Court is referring to are those that occur after the death has taken place. So those were not the mechanism by which the killing occurred. But in any event, these facts all added together, I think, are really neither more nor less egregious than many, many facts. Well, that's not really the question. Is it, does this show a difference between explosive brain disorder, where it might just be an incident where you could explode in anger, and Judge Ramos describing a calculated plan, is that more likely to be a result of a brain disorder than an explosive person, or not? I mean, what is relationship between the brain? Now, I understand you're saying there doesn't have to be a relationship, but is there a relationship between the kind of brain disorder that's physical and the kind of psychological explosive personality, which this might help explain, or not? I mean, I don't... I think the answer is that there is an element of explosion. You can deduce explosivity from looking at the crime. Yes, but that's what we have the first time. Well, Leavitt has explosive features to his personality. The question is why? Why is he explosive? Well, is it just explosive? What does the brain, physical brain ailment, disorder, whatever it is, would that relate in any way to the calculated aspect of this? Or is that unrelated? No, I think it's connected, although it's possibly... I mean, certainly an argument could be made that it's less directly connected, because of just what was just discussed. It seems more calculated. And yet, to be involved, to be there in the moment of that event, being driven by these explosive features, I don't know how you cut off a place there where you say, I'm no longer being driven by my explosive personality or the explosive features of it, or by my organic explosivity, and I'm now on to some other thing that we assign responsibility for in a different way. I'm not sure that that really is a distinction that is fair to make. Well, maybe the suggestion is that it has nothing to do with explosive personality, that this was driven by something else altogether. I mean, it partakes of a very different character to sit there and meticulously cut somebody open and plan by doing a deer. That doesn't sound explosive at all. But the rest of it, I mean, in this court, in our last opinion, recited the facts in such a way, the implacable force of the even so great as to have sliced a waterbed. And again and again, you see in the descriptions of this, this intensity, this obvious... There does seem to be an explosive element to at least part of the... But how important is this explosive element? I mean, if you have a physical brain disorder and you behave in this way, what difference does it make whether it's explosive or not? I don't think it makes any difference. I mean, I think it's what we were in a position to show, that he had organic brain injury. And I think, Your Honor, to answer the second part of your question about why it would have made a difference to Judge George, I just see it written all over his findings and his articulation on the record. He says that the second time around, he's finding that mental health issues are a mitigator, whereas he hadn't done that before. He's downstream from the Idaho Supreme Court saying, wait a second, this guy is atypical to anything he's seen. See, I just keep searching for why what you wanted in would have been so much more mitigating that it would have tipped the balance despite the calculation. Well, because it is that element of the Holy Grail. It's the thing we were just talking about. It is something that is not his fault. It's brain injury as opposed to just sort of a wicked, evil personality. The first time around, the conclusion had been antisocial personality disorder is what we have here. But the presence of organicity defeats antisocial personality disorder. So you have a whole different picture when you have this organic defect. And Judge George was very, very clear. Oh, I'm over my time, aren't I? Oh, I'm sorry. I thought it was still counting down. I apologize. But Judge George had said repeatedly, I want to afford him all his rights. This leaves one asking why, why this would have happened. And the answer was waiting right there. And he never found it. Thank you, Your Honor. We have half a minute left. We'll round it up to a minute. Thank you, Your Honor. Chief Judge Kuczynski, I want to answer your question. Which Judge George do you refer to? Do you consider? For the purposes of deficient performance, you have to consider the first Judge George. Because it was that individual that made the determination as to whether testing should be done in the first place. As to the second judge, as to the resentencing, the second Judge George and the first Judge George have to both be considered. It is, as I read Smith, a subjective test. What would Judge George have done with this additional information? How do you know what Judge George would have said about the fact that there is a physical brain disorder? A lot of people seem to think, rightly or wrongly, that that's a different reason to consider when you're evaluating a person who commits a horrendous crime. That if it's a physical brain disorder, we look at them differently than if it's a psychological defect, a bad personality, a bad guy as opposed to a sick guy. And I kind of agree with you. I mean, everybody who commits these crimes, there's something wrong with them. And what's the difference what it is? But how do you know that Judge George would not feel the way most people do? That if it's a physical brain disorder, we treat them differently. I understand that the courts have treated physical brain disorders differently. The problem that I'm having is the intermittent explosive disorder is a mental illness. As opposed to the antisocial personality disorder, which is a type of personality. And I think that we have mixed those two. And there's a closer correlation between a mental illness, which was the explosive, intermittent, the anger thing, as opposed to the brain. It's closer as opposed to the personality. Closer is no cigar or whatever. I understand that, Your Honor. And I understand the difference. I did want to point out on page 15 of the excerpts of record that from Judge Windmill's findings, counsel believed that the district court viewed the psychological evidence to be aggravating instead of mitigating. And because the court had denied the request for an MRI in 1985, it wouldn't do much good to take another run at the court either with additional testing or with pursuing that. But David Parmenter did have, knew that and did recognize that that MRI wasn't going to be granted. Okay. Thank you. Thank you, counsel. The case is now able to stand for a minute. We're adjourned.
judges: Kozinski, Reinhardt, Rymer